STATE OF NORTH CAROLINA v. RICKY LEE PRICE

No. 585A87

(Filed 7 February 1990)

### 1. Jury § 6.4 (NCI3d) — first degree murder — jury selection — questions concerning death penalty

The trial court did not err in a first degree murder prosecution by sustaining the State's objection during jury selection to the question of whether a potential juror felt it would be necessary for the State to show additional aggravating factors before he would vote to impose the death penalty. Although it is proper to inquire whether jurors can follow the law as charged, it is neither analogous nor proper to ask questions designed to gauge jurors' approval or to test their comprehension of the law. Moreover, inquiry into a juror's fitness to serve is within the discretion of the trial court.

**Am Jur 2d, Jury §§ 289, 290.**

### 2. Jury § 7.14 (NCI3d) — first degree murder — jury selection — use of peremptory challenges — jurors opposed to death penalty

The constitutional rights of a defendant in a first degree murder prosecution were not violated by the State's use of peremptory challenges to purge the jury of prospective jurors expressing reservations about the death penalty. Amendments Six and Fourteen of the U. S. Constitution, Article I, § 19 of the North Carolina Constitution.

**Am Jur 2d, Jury § 237.**

### 3. Jury § 7.12 (NCI3d) — first degree murder — jury selection — reservations about death penalty — excusal for cause

The trial court did not err in a first degree murder prosecution by excusing for cause two jurors who expressed reservations about the death penalty without asking whether they could conscientiously apply the law as charged by the court despite their objections. The trial court did not err in concluding that those jurors fit the profile of jurors appropriately excludable for cause as described in *Adams v. Texas*, 448 U.S. 38, and its progeny; furthermore, it is apparent from the response of both prospective jurors here that they could

STATE v. PRICE

[326 N.C. 56 (1990)]

not have considered the death penalty objectively under any circumstances.

**Am Jur 2d, Jury §§ 289, 290.**

4. **Criminal Law § 34.8 (NCI3d)— first degree murder—other offenses—admissible**

The trial court did not err in a first degree murder prosecution by admitting testimony describing two instances of prior misconduct involving a prior murder and a hostage taking. Testimony regarding a "virtually identical murder" committed less than seventy-two hours before the murder for which defendant was on trial lends more ballast to the act than to the character of the actor, and testimony regarding an incident occurring less than forty-eight hours after the second murder in which defendant admitted having killed more than once was similarly of substantive value and patently tipped the scales away from any unfair prejudicial effect. Moreover, the trial court was careful to divert the jury's attention away from character and towards purposes for which the evidence was deemed admissible by N.C.G.S. § 8C-1, Rule 404(b).

**Am Jur 2d, Homicide §§ 310-313.**

5. **Criminal Law § 34.8 (NCI3d)— first degree murder—prior misconduct—admissible**

The trial court did not err in a first degree murder prosecution by admitting testimony from a woman with whom defendant had previously lived that she had heard defendant call her name outside the bedroom of her mobile home, that this had frightened her, and that she had discovered the next morning that the screens had been removed from the two bedroom windows. The temporal proximity of the incident to the crime charged, to another murder, and to a hostage-holding, plus the fact that it was an intrusion upon the privacy of a former girlfriend, clearly demonstrate its admissibility for several purposes cited in N.C.G.S. § 8C-1, Rule 404(b).

**Am Jur 2d, Homicide §§ 310-313.**

6. **Criminal Law § 357 (NCI4th)— first degree murder—witness embraced by victim's family member—motion to strike testimony—denied**

The trial court did not err in a first degree murder prosecution by denying defendant's motion to strike identification

STATE v. PRICE

[326 N.C. 56 (1990)]

testimony from a witness who was embraced by a member of the victim's family after testifying. The embrace shared no similarities with the victim impact statements condemned in *Booth v. Maryland*, 482 U.S. 496; the only reference in the record to the embrace indicates that it occurred after court was over and there is no indication that it was viewed by members of the jury. The trial court concluded in denying defendant's motion to strike that the witness and the family member were not acquainted and that the embrace was no more than a display of encouragement and gratitude.

**Am Jur 2d, Homicide §§ 536, 537.**

7. **Criminal Law § 66.9 (NCI3d) — first degree murder — photographic identification — no substantial likelihood of misidentification**

The photographic identification procedure used by officers in a first degree murder prosecution was unnecessarily suggestive but did not lead to a substantial likelihood of misidentification where the procedure entailed a random display of two sets of photographs; the first set depicted six wedding groups or couples; the second was a pair of black and white photographs, one of which was a blowup of defendant's face from his wedding photograph; all but the photograph of defendant and his bride in the first set measured eight-by-ten inches; defendant's photo measured only four-by-six inches; and the appearance of each male other than defendant differed from the general description given to officers. The conditions were amply beneficial for two witnesses to have had an excellent opportunity to view defendant's profile and physique; both were concentrating acutely on what they were seeing; both described in remarkable detail salient facial and general physical features of the man they had seen; both were so certain that they had identified the right man that each testified that defendant was he unless he had a double or an identical look-alike; and less than thirty hours passed between their seeing the man in the woods and selecting defendant's photographs. A third witness was not permitted to identify defendant in court but was allowed only to describe the man he saw on the morning of the murder, and that description was not tainted because the witness was shown only the wedding photographs and did not experience the duplication of defendant's face into black and white. The witness's description of the man he saw

was general enough to be perfectly consistent with the view-point of one driving past and none of the characteristics described by the witness were so noteworthy that it was more likely to have originated in a view of the photographs than a view of defendant on the morning of the crime.

**Am Jur 2d, Evidence §§ 371.4-371.8, 372.**

8. **Homicide § 15.2 (NCI3d)— first degree murder—defendant's history of mental illness—excluded—no error**

The trial court did not err in a first degree murder prosecution by restricting defendant's attempts to cross-examine two witnesses about what they knew or had observed of defendant's history of mental illness and aberrant behavior. When a defendant has made a tactical choice not to exercise his right to call witnesses or to present a defense, it is well within the trial court's discretion to require that all of a document be offered into evidence rather than merely those self-serving portions reflecting upon defendant's mental balance, and to exclude hearsay testimony of defendant's hospitalization for mental problems.

**Am Jur 2d, Homicide §§ 292, 293.**

9. **Criminal Law §§ 69, 80 (NCI3d)— first degree murder—telephone conversation with victim—admission not prejudicial error**

There was no prejudicial error in a first degree murder prosecution from the admission of testimony by the victim's parents that she had called them collect around 8:45 a.m. on the morning that she was killed; an officer's testimony that he had traced the number of the telephone from which the call was made to a telephone booth in Chapel Hill, twenty-two miles from where the victim's body was found; or from a statement by defendant that he was with the victim when she called her parents, which the court ruled had been freely, voluntarily, and understandingly made. It is well established that the identity of a caller may be established by testimony that the witness recognized the caller's voice; the testimony could have had no possible prejudicial impact on the outcome of defendant's trial when defendant admitted that he was with the victim when she called her parents; the officer's testimony was utterly insignificant; the telephone bill was admissible to corroborate the testimony of the victim's parents about

STATE v. PRICE

[326 N.C. 56 (1990)]

when they received the call from their daughter; the bill was not properly admitted for substantive purposes under the business records exception to the hearsay rule because there was no foundation; and admission of the bill for substantive purposes was not prejudicial in the face of the quantum of other evidence. N.C.G.S. § 8C-1, Rule 803(6); N.C.G.S. § 15A-1443(a).

**Am Jur 2d, Homicide § 331.**

10. **Criminal Law § 43.4 (NCI3d) — first degree murder — photographs — admission no error**

The trial court did not err in a first degree murder prosecution by admitting into evidence seven photographs where it was not apparent that the photographs were limited to illustrative use when they were introduced and defendant arguably waived his objection, and defendant's contentions were baseless not only with regard to the unobjectionable content of the photographs but also to their restrained use.

**Am Jur 2d, Homicide § 416.**

11. **Criminal Law § 1361 (NCI4th) — first degree murder — sentencing — defendant's drug use — consideration limited for corroborative or impeachment purposes**

The trial court did not err during the sentencing phase of a first degree murder prosecution by limiting testimony about defendant's drug use for corroborative or impeachment purposes where defendant's admission to the witness that he had used drugs in the indefinite past bore no relevance to the possibility that he was affected by drugs throughout the five-day period that included two murders. Moreover, the witness was permitted to testify to a demeanor that suggested drug use by defendant, and defendant's periodic use of drugs was described on the stand by defendant himself, by his mother, by a childhood friend, and by his psychiatrist.

**Am Jur 2d, Criminal Law §§ 527, 598, 599, 628.**

12. **Criminal Law §§ 1337, 1347 (NCI4th) — first degree murder — aggravating circumstances — prior convictions involving violence — course of conduct**

The evidence in the sentencing phase of a first degree murder prosecution supported the aggravating circumstances

STATE v. PRICE

[326 N.C. 56 (1990)]

of a previous conviction involving the use of violence to the person and that this murder was part of a course of conduct that included the commission of other crimes of violence. Although arson is arguably not an offense that inherently involves violence against another person or persons in the absence of inhabitants, when inhabitants are present and the perpetrator is aware of this fact, the act of igniting their dwelling is indisputably an act of violence. It is apparent from a review of the chronology of events that defendant's actions were all elements of a five-day rampage fueled by defendant's overcommitment to women.

**Am Jur 2d, Criminal Law §§ 527, 598, 599, 628.**

13. **Criminal Law § 458 (NCI4th)— first degree murder—sentencing—argument concerning parole—not permitted**

The trial court did not err during the sentencing portion of a first degree murder prosecution by not permitting defense counsel to argue to the jury anything concerning the possibility of parole or that the judge would be empowered to require a life sentence to commence at the termination of a life sentence defendant was then serving in Virginia. A criminal defendant's status under the parole laws is irrelevant to a determination of his sentence and an argument concerning the effect of consecutive life sentences upon the period of defendant's incarceration is equally irrelevant.

**Am Jur 2d, Criminal Law §§ 627, 630; Trial §§ 229, 231.**

14. **Criminal Law § 436 (NCI4th)— first degree murder—sentencing—prosecutor's argument—lack of remorse**

The trial court did not err during the sentencing portion of a first degree murder prosecution by failing to intervene ex mero motu when the prosecutor called the jury's attention to defendant's lack of remorse and his unwillingness to admit guilt. The State never cited remorselessness to the jury as aggravating conduct and urging jurors to focus on their observation that defendant showed no remorse relates to the demeanor displayed by defendant throughout the trial. Remarks rooted in observable evidence are not improper.

**Am Jur 2d, Trial § 234.**

15. **Criminal Law § 447 (NCI4th) — first degree murder — sentencing — prosecutor's argument on rights of victim**

    The trial court did not err in the sentencing portion of a first degree murder prosecution by not intervening ex mero motu when the prosecutor referred in his closing statement to the rights of the victim and her family. The personal qualities of the victim and the devastation wrought upon her family by her death were not invoked by the prosecutor's words in this case; these issues were the subject of mere allusion by the prosecutor; if improper, the error was de minimis; and it was well within the court's discretion not to intervene ex mero motu.

    **Am Jur 2d, Trial §§ 296-299.**

16. **Criminal Law § 442 (NCI4th) — first degree murder — sentencing — prosecutor's argument on sympathy**

    The trial court did not err in the sentencing phase of a first degree murder prosecution by not intervening ex mero motu where the prosecutor admonished the jury not to allow sympathy to inform their recommendation as to defendant's sentence. The prosecutor was plainly and properly admonishing the jurors that feelings of sympathy and forgiveness rooted in their hearts and not also in the evidence may not be permitted to affect their verdict, and the prosecutor made absolutely no reference to evidence offered by defendant in mitigation.

    **Am Jur 2d, Trial §§ 280, 281.**

17. **Criminal Law § 1323 (NCI4th) — first degree murder — sentencing — instructions on weighing aggravating and mitigating factors — no error**

    The trial court in its instructions in the sentencing portion of a first degree murder prosecution did not improperly emphasize the significance and weight of aggravating circumstances or tilt the scales toward aggravating circumstances with its definition of mitigating circumstances.

    **Am Jur 2d, Criminal Law §§ 598, 599, 628; Trial §§ 888, 892-894.**

18. **Criminal Law § 1323 (NCI4th) — first degree murder — sentencing — aggravating and mitigating circumstances — instructions**

    The trial court did not err during the sentencing portion of a first degree murder prosecution in its instructions on

STATE v. PRICE

[326 N.C. 56 (1990)]

weighing aggravating and mitigating factors where, read as a whole, the trial court's charge indicates no perceptible emphasis on aggravating over mitigating circumstances.

**Am Jur 2d, Criminal Law §§ 598, 599, 628; Trial §§ 888, 892-894.**

19. **Criminal Law § 881 (NCI4th)— first degree murder—sentencing—jury hung—additional instructions—no abuse of discretion**

The trial court did not abuse its discretion during the sentencing phase of a first degree murder prosecution by instructing the jury and giving it additional time for deliberations after the foreman indicated that the jury was hung. The jurors had before them two aggravating circumstances and ten mitigating circumstances; they deliberated for nearly four hours over two days; the trial judge heard all of the evidence in support of aggravating and mitigating factors, observed the jurors' demeanor, and instructed them according to the law as he determined it necessary to their comprehension of their duty as jurors; and the trial judge was then in the best position to determine how much time was reasonable for the jurors' deliberations regarding a recommendation for punishment under the facts of the case.

**Am Jur 2d, Criminal Law § 303; Trial § 1109.**

20. **Criminal Law § 1325 (NCI4th)— first degree murder—sentencing—mitigating factors—requirement of unanimity**

Requiring a jury to unanimously find mitigating circumstances in the sentencing portion of a first degree murder prosecution does not violate a defendant's rights under the Eighth Amendment to the U. S. Constitution.

**Am Jur 2d, Homicide §§ 548, 553-555; Trial §§ 888, 892, 894.**

21. **Criminal Law § 1327 (NCI4th)— first degree murder—sentencing—instruction on duty to return death penalty**

It is constitutional to inform a jury of its duty to return a recommendation of death when it finds mitigating circumstances insufficient to outweigh aggravating circumstances and the latter sufficiently substantial to call for the death penalty.

**Am Jur 2d, Homicide §§ 548, 553-555; Trial §§ 888, 892, 894.**

STATE v. PRICE

[326 N.C. 56 (1990)]

**22. Constitutional Law § 63 (NCI3d)— death penalty—excusing for cause jurors opposed—constitutional**

Excusing for cause jurors who have stated their opposition to the death penalty is constitutionally permissible.

**Am Jur 2d, Jury §§ 289, 290.**

**23. Criminal Law § 1326 (NCI4th)— first degree murder—sentencing—mitigating circumstances—burden of proof**

It is constitutional when sentencing defendant for first degree murder to place on defendant the burden of proving each mitigating circumstance by a preponderance of the evidence and to not require the State to prove the nonexistence of each proffered mitigating circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**24. Constitutional Law § 80 (NCI3d)— death penalty—constitutional**

The North Carolina death penalty statutes, N.C.G.S. § 15A-2000 through -2003, are constitutional.

**Am Jur 2d, Criminal Law §§ 628, 631; Homicide §§ 556, 557.**

**25. Criminal Law § 1373 (NCI4th)— first degree murder—sentencing—more than one murder—death not disproportionate**

The death penalty for a first degree murder was not imposed arbitrarily or capriciously and was not disproportionate where defendant had killed more than once.

**Am Jur 2d, Homicide §§ 552-554.**

Justice FRYE concurring in result.

APPEAL of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing the sentence of death entered by *Hobgood, J.,* at the 8 September 1987 Criminal Session of Superior Court, PERSON County. Heard in the Supreme Court 14 December 1989.

*Lacy H. Thornburg, Attorney General, by Barry S. McNeill, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Gordon Widenhouse, Assistant Appellate Defender, for defendant-appellant.*

## STATE v. PRICE

[326 N.C. 56 (1990)]

WHICHARD, Justice.

Defendant was tried on a true bill of indictment charging him with murder in the first degree. The jury found him guilty as charged and recommended a sentence of death. Our scrutiny of the record of the guilt and sentencing phases of his trial reveals that both were conducted without prejudicial error.

At approximately 10:00 a.m. on Sunday, 21 October 1984, a man later identified as defendant was spotted squatting in the woods near Hurdle Mills by Anne and Tony Wrenn, who had been walking with their son. The couple later testified that the man had jumped up suddenly, snatched a shirt from the ground, and fled. Ray Farrish, a passenger in a car travelling on State Road 1001 near the same woods, testified that at about the same hour he saw a shirtless, white male, whom he later identified as defendant, running towards a light blue car parked on the roadside. Mr. Farrish saw the man fumble with keys and attempt to unlock the car door. When the car in which Mr. Farrish was riding returned twenty minutes later, the blue car was gone.

The Wrenns discovered that the man had been crouched over the body of Brenda Smith, who a forensic pathologist later testified had died of ligature strangulation with "something broad." The victim's hands were tied behind her body with a brown shoestring.

Evidence was introduced at defendant's trial tending to show that he had been responsible for the death by ligature strangulation of Joan Brady in Danville, Virginia, on October 19th, less than three days before Brenda Smith's body was found. The hands and feet of Ms. Brady had been bound similarly with shoelaces. The State's evidence also revealed that defendant had had romantic liaisons with each victim and that he had told a recent female acquaintance that he wanted to move in with her, partly to get away from Joan Brady.

In addition, witnesses for the State who had been in contact with defendant the day after Brenda Smith's body was found described an episode at the house of defendant's uncle, James Hardy, which resulted in defendant's arrest. Around 5:00 p.m. on Monday, 22 October 1984, defendant's cousin Darryl Gammon went to James Hardy's house. Gammon testified that he followed noises to the basement and there found Hardy bound and gagged. Defendant was behind a curtain with a flashlight and a knife. Gammon at-

STATE v. PRICE

[326 N.C. 56 (1990)]

tempted to restrain defendant with a gun, but defendant threatened him with the knife, then forced Gammon to release the gun by holding the knife to the throat of a fourth man. Police officers arrived, but defendant held them at bay for approximately five and one-half hours before he was arrested. In the interim, he uttered a number of incriminating statements, including the admissions that he had killed two people and would kill again, and that he was good with shoelaces. Both a class ring and a key chain belonging to Brenda Smith were found on defendant's person.

An inmate with whom defendant had been incarcerated pending his trial testified that defendant had admitted to killing Brenda Smith and Joan Brady. Defendant confided that he had been dating too many women, that he had been suffering from too much pressure, and that he had felt he had to eliminate somebody.

## JURY SELECTION ISSUES

[1] Defendant's first assignments of error concern the selection of a jury for his trial. Defendant initially complains that the trial court erroneously sustained the State's objection to the question whether a potential juror "[felt] it should be necessary for the State to show additional aggravating circumstances before [he] would vote to impose the death penalty." Defendant argues that his question was proper because its intent was merely to plumb the potential juror's attitudes or prejudices; it did not impermissibly "stake out" the juror as to what his position might be under a given state of facts. *State v. Vinson*, 287 N.C. 326, 336, 215 S.E.2d 60, 68 (1975), *death penalty vacated*, 428 U.S. 902, 49 L. Ed. 2d 1206 (1976). He contends that the trial court's action thwarted his statutory right to conduct a voir dire examination of jurors in order "to ascertain whether there exist grounds for challenge for cause; and . . . to enable counsel to exercise intelligently the peremptory challenges allowed by law." *State v. Allred*, 275 N.C. 554, 558-59, 169 S.E.2d 833, 835 (1969) (quoting *State v. Brooks*, 57 Mont. 480, 486, 188 P. 942, 943 (1920)). We disagree.

Although it is proper under appropriate circumstances to inquire of jurors whether they can follow the law as charged by the court, *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980), it is neither analogous nor proper to ask questions designed to gauge jurors' approval or to test their comprehension of the law. Moreover, while counsel may inquire diligently into a juror's fitness to serve, the extent and manner of that inquiry rests within

STATE v. PRICE

[326 N.C. 56 (1990)]

the sound discretion of the trial court. *State v. Parks*, 324 N.C. 420, 423, 378 S.E.2d 785, 787 (1989). Defendant has failed to show either a clear abuse of discretion on the part of the trial court or resulting prejudice.

[2] Defendant next raises the issue that his constitutional rights under the sixth and fourteenth amendments to the United States Constitution and under article I, section 19 of the Constitution of North Carolina were violated by the State's use of peremptory challenges to purge the jury of prospective jurors expressing reservations about the death penalty. This Court, cognizant of arguments to the contrary, such as that articulated in *Brown v. Rice*, 693 F. Supp. 381 (W.D.N.C. 1988), has consistently rejected this position. *See, e.g., State v. Quesinberry*, 325 N.C. 125, 142-43, 381 S.E.2d 681, 692 (1989). Defendant presents no new reason for this Court now to question the soundness of its prior holdings in this regard.

[3] Defendant also contends that his right to conduct a voir dire of potential jurors was abridged when two jurors who had expressed reservations about the death penalty were excused for cause without being asked whether, despite such objections, they could "conscientiously apply the law as charged by the court." *Adams v. Texas*, 448 U.S. at 45, 65 L. Ed. 2d at 589. Both jurors expressed their opposition to the death sentence in unequivocal terms, even after defendant's attempt to rehabilitate them. In both instances the jurors answered in the affirmative to the State's question whether the jurors' feelings about the death penalty "would prevent or substantially impair" their ability to vote for or to impose the death penalty.

In *State v. Quesinberry*, 325 N.C. at 139, 381 S.E.2d at 690, we held that there was no error in asking prospective jurors whether their views about the death penalty would "prevent or substantially impair" their "ability to sit on [the jury.]" This inquiry effectively mirrored the words of the United States Supreme Court in *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (quoting *Adams v. Texas*, 448 U.S. at 45, 65 L. Ed. 2d at 589), that such a juror may be removed for cause if his views about the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

In this case the State's similar narrowing of the *Wainwright* inquiry in order to determine whether jurors' reservations might

inhibit their consideration of the death penalty reiterates the essential language set out in *Adams* and *Wainwright*. Further, it is apparent from the responses of both prospective jurors here that they could not have considered the death penalty objectively under any circumstances, even under the guidance of the trial court's instructions. The trial court did not err in concluding that these jurors fit the profile of jurors appropriately excludable for cause as described in *Adams* and its progeny.

GUILT PHASE ISSUES

[4] Defendant assigns error to the admission of witnesses' testimony describing two instances of defendant's prior misconduct—the murder of Joan Brady and the incident of holding his uncle hostage. The first offense was recounted through the testimony of Joan Brady's sister, who discovered the body, and that of an investigating officer. This testimony was admitted, accompanied by the trial court's repeated instruction to the jury that such evidence was before it for the sole purpose of showing defendant's knowledge. Each witness described the appearance of the victim's body, found on Friday, 19 October 1984, face-down in bed, her limbs bound with shoelaces. The admission of the pathologist's testimony, which added that the victim had died as the result of a "soft ligature," like the handkerchief found knotted around her neck, was similarly restricted to the purpose of showing preparation, plan, or knowledge of the defendant. Defendant contends that this testimony was only "minimally relevant" and that its prejudicial effect outweighed any probative value.

Defendant restates this contention with regard to the testimony of his cousin Darryl Gammon and others, who recounted the details of defendant's act of holding his uncle hostage the day after Brenda Smith's death. Defendant assigns error as well to the admission of statements he made in the presence of officers who were summoned to the scene. These statements included defendant's admission that he was "good with shoelaces" and that he had "already killed two and one or two more wouldn't make any difference."

Upon defendant's motion to suppress evidence of both occurrences, the trial court conducted extensive voir dire, after which it concluded that testimony regarding the ligature strangulation of Joan Brady was "virtually identical prior misconduct" taking place only two and one-half days before the murder of Brenda Smith. The trial court held the pathologist's testimony admissible

under N.C.R. Evid. 404(b) for the purpose of showing preparation, plan or knowledge, as its charge to the jury later reflected.

Voir dire testimony reiterating statements defendant had made during the hostage-holding incident also was ruled relevant and admissible under Rule 404(b) for the limited purpose of showing motive, intent, preparation, plan, knowledge or identity. In addition, the trial court reported in its order that it had applied the balancing test stated in Rule 403 and found that the probative value of these statements substantially outweighed any prejudicial effect they might have.

Our appraisal of the testimony of which defendant complains convinces us that the trial court's assessment of its admissibility was accurate. This Court recently noted that Rule 404(b) was inspired by the observation in *State v. Young*, 317 N.C. 396, 346 S.E.2d 626 (1986), that evidence of prior offenses by a defendant is "inadmissible on the issue of guilt if its only relevancy is to show the character of the accused or his disposition to commit an offense of the nature of the one charged." *State v. Artis*, 325 N.C. 278, 299, 384 S.E.2d 470, 481 (1989) (quoting *Young*, 317 N.C. at 412, 346 S.E.2d at 635). Rule 404(b), a codification of the *Young* rule, provides specific guidance as to how prior offenses might otherwise be relevant. The probative weight of such evidence and its "use . . . as permitted under Rule 404(b) is guided by two constraints: similarity and temporal proximity." *Id*. Factual disparity or the stretch of time dilute commonalities, and "the probative value of the analogy attaches less to the acts than to the character of the actor." *Id*. Conversely, testimony regarding a murder that was "virtually identical" committed less than seventy-two hours before the murder for which the defendant is on trial lends more ballast to the act than to the character of the actor. Under these circumstances, the probative value of such evidence is unassailable.

Testimony regarding an incident occurring less than forty-eight hours after the second murder, in which defendant admitted to having killed more than once, was similarly of substantial probative value and patently tipped the scales away from any unfair prejudicial effect. See N.C.G.S. § 8C-1, Rule 403 (1988). Following a voir dire, the trial court carefully assessed the admissibility of the testimony in accordance with statutory mandate and was careful to divert the jury's attention away from character and towards

the purposes for which evidence is deemed admissible by Rule 404(b). We hold that it did not err in doing so.

[5]  We draw the same conclusion with regard to testimony by Janice Bates, a woman with whom defendant had lived from June 1983 to September 1984, which defendant contends was admitted despite its irrelevance and its tendency to serve only as evidence of his bad character. Ms. Bates testified that she heard defendant call her name outside the bedroom of her mobile home between 12:00 and 2:00 a.m. Monday, 22 October 1984, and that this had "frightened" her. The next morning she discovered that the screens had been removed from the two bedroom windows. In response to defendant's objection, the trial court again conducted voir dire and limited the witness' proffered testimony, ruling that what remained was relevant and that its probative value was not substantially outweighed by the danger of unfair prejudice, confusing the issues or misleading the jury.

Although the trial court did not assess the admissibility of Ms. Bates' testimony in terms of Rule 404(b) as it had for the Brady murder and the hostage-holding, it is clear this act was similarly offered to prove preparation, plan or knowledge. The temporal proximity of the incident recounted by Ms. Bates, not only to the crime charged, but also to the Brady murder and the hostage-holding, plus the fact that it was an intrusion upon the privacy of a former girlfriend, clearly demonstrate its admissibility for several of the purposes cited in Rule 404(b). Its fit into this pattern of incidents lends it probative value far exceeding any tendency to prejudice the jury, for the latter is at best negligible where the conduct exhibited by defendant was so much less blameworthy than that of the other two incidents. Although there was little if any probative value to Ms. Bates' admission that defendant's approach "frightened" her,[1] its prejudicial impact, if any, was de minimis, and could not possibly have had any effect on the jury's ultimate verdict. N.C.G.S. § 15A-1443(a) (1988).

[6]  Defendant also contends that the trial court erroneously denied his motion to suppress in-court identification or other identification testimony by the Wrenns and by Ray Farrish. His objections to

---

1. The trial court admonished the witness in its ruling on the admissibility of her testimony that she was not to indicate to the jury the reason for that fear—that police officers had visited her home that afternoon in their search for defendant and had divulged that defendant was suspected in two murders.

**STATE v. PRICE**

[326 N.C. 56 (1990)]

the testimony of Ms. Wrenn are twofold. First he notes the fact that after testifying, Ms. Wrenn was embraced by a member of the victim's family, and he argues that this act violates proscriptions stated in *Booth v. Maryland*, 482 U.S. 496, 96 L. Ed. 2d 440, *reh'g denied*, 483 U.S. 1056, 97 L. Ed. 2d 820 (1987), against putting before the jury written commentary on the loss felt by the victim's family. This application of the precepts stated in *Booth* distorts its rationale. A spontaneous embrace shares no similarities with the presentation to the jury of "victim impact statements" condemned in *Booth*. Moreover, the only reference in the record to this embrace indicates that it occurred "after court was over"; there is no indication of record that it was viewed by members of the jury. In denying defendant's motion to strike Ms. Wrenn's identification testimony on these grounds, the trial court concluded that Ms. Wrenn and the family member were not acquainted and that the embrace was no more than a display of encouragement and gratitude.

We conclude that the trial court ruled correctly. Further, it was only after the voir dire of Tony Wrenn, rather than at the time of the alleged embrace, that defendant objected or made a motion to strike Ms. Wrenn's earlier identification testimony. A display that made so little impression upon the defendant at the time of its occurrence could have had no conceivable prejudicial effect on the jury.

[7] Second, defendant contends that the photographic identification procedure used by officers for the benefit of Ray Farrish and the Wrenns was impermissibly suggestive and tainted the Wrenns' in-court identification of defendant as the man they had seen run from the vicinity of Brenda Smith's body the morning of 21 October 1984.[2] The procedure to which defendant objected entailed a random display of two sets of photographs. The first set depicted six wedding groups or couples; the second was a pair of black-and-white photographs, one of which was a blow-up of defendant's face from his wedding photograph. Of the first set, all but the photograph of defendant and his bride measured eight-by-ten inches; defendant's wedding photograph measured only four-by-six. In addition, the appearance of each male depicted, other than defendant, differed from the general description Ms. Wrenn

---

2. The trial court sustained defendant's objection to the in-court identification by Ray Farrish.

STATE v. PRICE

[326 N.C. 56 (1990)]

initially had given the officers. Defendant contends that this meager field of comparison and the size discrepancy of the photographs predisposed the Wrenns to select defendant's photograph from both sets.

The trial court conducted voir dire of Anne Wrenn, of the officer who heard her description shortly after seeing the man flee from the woods, and of the officer who conducted the photo-identification procedure. After making extensive findings of fact, the trial court concluded that Ms. Wrenn had had "ample opportunity to gain a reliable impression" of the man she viewed in the woods, that her attention on the man was "strong and focussed," that her description to officers of the man she had seen was accurate and matched the physical characteristics of defendant, and that the time lapse between Ms. Wrenn's observation of the man Sunday morning was not so long as to significantly diminish her ability to make a strong and reliable identification the following afternoon. With regard to the identification procedure, the trial court concluded that, given the high degree of certainty of Ms. Wrenn's identification, the pretrial identification procedure had not been "so impermissibly suggestive and conducive to irreparable mistaken identification as to constitute a denial of due process of law."

The pretrial identification procedure experienced independently by Tony Wrenn was virtually identical to that of his wife. Following voir dire of Tony Wrenn, the trial court recognized the striking specificity of Mr. Wrenn's initial observation of the man in the woods, including Mr. Wrenn's awareness of the man's size, weight, notable musculature, the color and neat cut of his hair and beard, and a prominent nasal bridge, all of which were similar to defendant's physical characteristics. Based upon Tony Wrenn's excellent opportunity to observe the man in the woods, the high degree of his attention, and the minimal time lapse between that occurrence and the pretrial photo identification, the trial court again concluded that the pretrial procedure was reliable and that Mr. Wrenn's subsequent in-court identification was not tainted by anything impermissibly suggestive in the pretrial procedure.

On the evening of 22 October 1984, Mr. Farrish was shown only the group of wedding photographs. Although at that time he identified the photograph of defendant as the one most resembling the man he had seen the morning before, in court Mr. Farrish misidentified the photograph he previously had selected. Based

STATE v. PRICE

[326 N.C. 56 (1990)]

upon Mr. Farrish's voir dire testimony, the trial court concluded that although the misidentification went to the credibility of the witness rather than to the admissibility of his testimony, the in-court identification by Mr. Farrish was not admissible because it did not appear to be of independent origin. However, Mr. Farrish was permitted to describe for the jury the appearance of the man he had seen that morning, for the trial court did not find that this observation had been tainted by any pretrial procedure.

The test to be applied when the admissibility of identification evidence is challenged is to seek facts that "reveal a pretrial identification procedure so impermissibly suggestive that there is a very substantial likelihood of irreparable misidentification." *State v. Pigott*, 320 N.C. 96, 99, 357 S.E.2d 631, 633 (1987) (quoting *State v. Harris*, 308 N.C. 159, 162, 301 S.E.2d 91, 94 (1983)). Assuming arguendo that the use of defendant's photograph in both of two very limited sets and the discrepancy in size of his wedding photograph from the remaining five eight-by-tens presented the Wrenns with photographic groups that were "unnecessarily suggestive," *id.*, their identification of defendant based upon their view of these photographs was not inadmissible unless the procedure led to a "substantial likelihood of misidentification." This possibility is tested by weighing the following factors against the corrupting effect of the suggestive procedure itself:

1) The opportunity of the witness to view the criminal at the time of the crime;

2) the witness' degree of attention;

3) the accuracy of the witness' prior description;

4) the level of certainty demonstrated at the confrontation; and

5) the time between the crime and the confrontation.

*Id.* at 99-100, 357 S.E.2d at 634 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154 (1977)).

As the trial court observed in its findings of fact following voir dire of the Wrenns, the conditions were amply beneficial for each to have had an excellent opportunity to view the defendant's profile and physique, both were concentrating acutely on what they were seeing, both described in remarkable detail salient facial and general physical features of the man they had seen, and both were so certain that they had identified the right man that each

testified defendant was he, "unless he had a double" or an "identical look-alike." That less than thirty hours had passed between their seeing the man in the woods and selecting defendant's photographs also buttresses the trial court's conclusion that there was scant likelihood that any suggestiveness in the pretrial identification procedure could have led to a misidentification of defendant by the Wrenns.

Because Mr. Farrish was not permitted to identify defendant in court but was allowed only to describe the man he saw the morning of 22 October 1984, only that description arguably was tainted by a suggestive pretrial procedure. We reject this possibility for two reasons. First, Mr. Farrish was shown only the wedding photographs. He thus did not experience the suggestiveness in the duplication of defendant's face into black-and-white, which defendant argues affected the Wrenns. Second, the record reflects that Mr. Farrish's description of the shirtless man he saw fumbling with keys was general enough to be perfectly consistent with the viewpoint of one driving past: Mr. Farrish described the man's height and approximate weight, his race, the color of his hair, the fact he was shirtless, and his actions. None of these characteristics is so noteworthy that it is likely to have originated in a view of the photographs rather than in the view of defendant on the morning of the crime.

[8] Defendant next contends that the trial court improperly restricted his attempts to cross-examine witnesses Janice Bates and Detective Holley about what they knew or had observed of defendant's history of mental illness and aberrant behavior. Janice Bates was prevented from testifying that defendant had told her of previous hospitalizations for mental illness, and Detective Holley was precluded from reading from the transcript of audio tapes made during the hostage-holding incident at the Hardy house. Detective Holley was permitted to testify as to his recollection of defendant's statements made at that time and to refresh that recollection from the transcript, but the trial court sustained the State's objection to reading from the transcript unless it was introduced in its entirety. The court added that it would permit defendant to offer the transcript into evidence at that time, but defendant's counsel deferred, stating that he had made "a tactical choice and that choice probably will be not to put on evidence."

Relying upon this Court's language in State v. Helms, 322 N.C. 315, 367 S.E.2d 644 (1988), and in State v. McElrath, 322 N.C.

STATE v. PRICE

[326 N.C. 56 (1990)]

1, 366 S.E.2d 442 (1988), which stresses the "relatively lax" standard of relevant evidence, *McElrath*, 322 N.C. at 13, 366 S.E.2d at 449, defendant argues that testimony tending to show his mental imbalance was relevant on the issue of whether he could have formed the specific intent to kill. Under a standard allowing "any evidence calculated to throw light upon the crime charged," *id.* (quoting *State v. Huffstetler*, 312 N.C. 92, 104, 322 S.E.2d 110, 118 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985)), defendant accurately argues that evidence of his limited or impaired mental capacity was relevant to the issue of whether he had the capacity to premeditate or deliberate, *State v. Shank*, 322 N.C. 243, 248, 367 S.E.2d 639, 643 (1988).

Not all relevant evidence, however, is admissible. Even relevant evidence may be excluded if its probative value is outweighed by the danger that it may confuse or mislead the jury. *State v. Knox*, 78 N.C. App. 493, 495, 337 S.E.2d 154, 156 (1985). Although an accused is assured the right to cross-examine adverse witnesses, the trial court is granted broad discretion in controlling its scope. Absent a showing of abuse of that discretion, such rulings will not be disturbed on appeal. *E.g., State v. Herring*, 322 N.C. 733, 743, 370 S.E.2d 363, 368 (1988). When a defendant has made a tactical choice not to exercise his right to call witnesses or to present a defense, it is well within the trial court's discretion to require that all of a document be offered into evidence, rather than merely those self-serving portions reflecting upon a defendant's mental imbalance. It is likewise well within the trial court's discretion to exclude hearsay testimony of defendant's hospitalization for mental problems when defendant has made a tactical choice not to proffer evidence of impaired mental capacity and its possible effect on his ability to premeditate and deliberate. Absent a context to which such evidence might relate, its relevance is considerably diluted, and its potential for confusion correspondingly enhanced. Under such circumstances, it is both proper and within the trial court's discretion to bar the admission of such evidence through cross-examination.

[9] Defendant next assigns error to the admission of testimony by the victim's parents that she had called them collect around 8:45 a.m. on 21 October 1984, and of a telephone bill corroborating that fact. Although the trial court prohibited the victim's parents from testifying as to the contents of the phone call, it ruled that testimony that their daughter had called collect was material and

relevant to show that she was alive at the time. An officer subsequently was permitted to testify that he had traced the number of the telephone from which the call had been made to a phone booth in Chapel Hill, twenty-two miles from where the victim's body was found later the same morning. In the same order the trial court ruled defendant's statement to police officers that he was with Brenda at the time she called her parents had been freely, voluntarily, and understandingly made. This conclusion is soundly supported by competent evidence in the record.

Defendant's contentions that the court erred in admitting the testimony of the victim's parents are wholly without merit. It is well established that the identity of a caller may be established by testimony that the witness recognized the caller's voice. *State v. Rinck*, 303 N.C. 551, 568, 280 S.E.2d 912, 924 (1981); *State v. Williams*, 288 N.C. 680, 698, 220 S.E.2d 558, 571 (1975). A witness' identification of the speaker by voice is not hearsay because there is no "assertion" implied or intended in that communication. *See* N.C.G.S. § 8C-1, Rule 801(c) (1988). *See also State v. Peek*, 89 N.C. App. 123, 125, 365 S.E.2d 320, 322 (1988) (defendant's name and address inscribed or printed on envelope or its contents not an assertion). The fact that the telephone call was collect was within the first-hand knowledge of Mr. Smith, who testified that he had accepted it. *See* N.C.G.S. § 8C-1, Rule 602 (1988). Even assuming erroneous admission of this evidence, the testimony regarding the call can have had no possible prejudicial impact on the outcome of defendant's trial when defendant admitted that he was with the victim when she called her parents; the officer's testimony can have had none by virtue of its utter insignificance.

The telephone bill was admissible to corroborate the Smiths' testimony about when they received the call from their daughter. *See* 1 Brandis on North Carolina Evidence 3d § 142 at 648; § 155 at 713 (1988). However, the State also offered the Smiths' bill substantively: the number recorded as coinciding with the victim's call to her parents led an officer to the booth from which the call had originated. The trial court, relying upon the "business records exception" to the hearsay rule, N.C.G.S. § 8C-1, Rule 803(6) (1988), determined that the information contained in the telephone bill was inherently reliable because of the routine manner in which such records are universally prepared.

A telephone bill is a "data compilation . . . kept in the course of a regularly conducted business activity" within the meaning

STATE v. PRICE

[326 N.C. 56 (1990)]

of the business records exception to the hearsay rule. N.C.G.S. § 8C-1, Rule 803(6) (1988). As such, it is admissible when "a proper foundation . . . is laid by testimony of a witness who is familiar with the . . . records and the methods under which they were made so as to satisfy the court that the methods, the sources of information, and the time of preparation render such evidence trustworthy." *State v. Springer*, 283 N.C. 627, 636, 197 S.E.2d 530, 536 (1973). No such witness testified in this case, and absent the laying of a foundation for its admission, the Smiths' telephone bill was not properly admitted for substantive purposes.

Data included in the bill enabled an officer to trace the victim's call and to testify that it had been generated from a location only twenty-two miles from where her body was found one and one-half hours later. This fact did nothing to support defendant's averred innocence. However, in the face of the quantum of other evidence, including defendant's inculpatory statements made in the presence of police officers and his admission that he was with the victim when the phone call was made, evidence of their location at the time was of little moment. We thus hold that the error of admitting the telephone bill without a foundation is not so prejudicial that there is any reasonable possibility that a different verdict would have been reached had the trial court barred the bill's admission. N.C.G.S. § 15A-1443(a) (1988).

[10] Defendant next takes issue with the admission into evidence of seven photographs, charging that their use was excessive and repetitious and their effect inflammatory and unfairly prejudicial. When the photographs were initially introduced into evidence to illustrate the testimony of Anne Wrenn, the trial court specifically asked defense counsel if he had any objection to the tender of the photographs into evidence. He replied that he had none. Defendant did not fail to object, however, when the photographs subsequently were made the subject of the testimony of the photographer who took them and tendered "for all purposes." The trial court balanced the probative value of the photographs against their tendency to inflame the emotions of the jury in accordance with N.C.G.S. § 8C-1, Rule 403 and overruled defendant's objection.

The trial court did not err in its conclusions. It is not apparent from the record that when the photographs were first introduced into evidence, their purpose was limited to their illustrative use. Defendant thus arguably waived his objection to subsequent substan-

STATE v. PRICE

[326 N.C. 56 (1990)]

tive use. *See State v. Gladden*, 315 N.C. 398, 414-15, 340 S.E.2d 673, 684, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986). However, even if defendant's subsequent objection is understood to focus upon prejudicial repetition, a review of the subject matter of the photographs and the occasions for their use reveals that defendant's assignment of error nevertheless lacks merit.

Although there is no bright line test for gauging at what point the use of photographs becomes excessive, *see State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988), the illustrative and substantive use of the seven photographic exhibits in this case falls well within noninflammatory limits. Only two photographs of the victim at the crime scene were before the jury — one a shot of her body from the back, the other a shot of her bound hands only — and these were neither gory nor otherwise gruesome. The five remaining photographs of the crime scene were primarily of the physical setting itself, in which the victim's body figured only incidentally. The photographs were later reintroduced for substantive purposes when they were authenticated by the photographer, but his testimony did not include a description of their contents, and the record does not reflect that they were used illustratively or exhibited to the jury for any other reason at that time. Exhibit 1, which depicted the victim's full body, was used on two other occasions for illustrative purposes — once to accompany the testimony of the forensic pathologist who performed the autopsy,[3] and once to accompany the testimony of the officer who responded to a call from the Wrenns. These facts reveal defendant's contentions to have been baseless with regard not only to the unobjectionable content of the photographs, but also to their restrained use. Defendant's assignments of error pertaining to this issue are thus overruled.

SENTENCING PHASE

[11] During the sentencing phase of his trial defendant called Janice Bates to the stand to testify about defendant's use of drugs throughout the period they had cohabited. Ms. Bates admitted that she had no personal knowledge of defendant's use of drugs, but

---

3. Defendant did not object to admitting autopsy photographs into evidence to illustrate the pathologist's testimony, but he did object to their being exhibited to the jury. The trial court ruled accordingly, prohibiting the jury from viewing them at that time. It is not apparent from the record that these photographs were ever given to the jury to view, even during its deliberations.

testified that defendant had told her that he had used drugs in the past.

Upon the State's objection, the trial court instructed the jury that it could consider this testimony only for the purpose of corroborating or impeaching defendant's testimony. This limitation on the substantive use of defendant's statements was reiterated during the trial court's final charge to the jury. Defendant argues that restricting this portion of Ms. Bates' testimony to its use as corroboration or impeachment denied him his constitutional right to offer mitigating evidence in a sentencing proceeding. *See Eddings v. Oklahoma*, 455 U.S. 104, 113-14, 71 L. Ed. 2d 1, 11 (1982).

This Court has held that in a capital sentencing proceeding a hearsay statement by a defendant or by a witness for the defense that is relevant to a sentencing issue and that bears "suitable indicia of reliability under a due process standard" must be admitted. *State v. Barts*, 321 N.C. 170, 181-82, 362 S.E.2d 235, 241 (1987). In this case, however, defendant's statements to Ms. Bates need not be analyzed for their trustworthiness, for defendant's admission to the use of drugs in the indefinite past bore no relevance to the possibility that he was affected by drugs throughout the five-day period that included two murders. The suggestion that past use might indicate inebriation during the period at issue is tenuous at best, and the trial court properly restricted its consideration by the jury to corroboration.

Moreover, assuming relevance arguendo, any error in the restriction of Ms. Bates' testimony was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1988). Following the trial court's limiting instruction, Ms. Bates was permitted to testify that on the day in September 1984 when she asked defendant to move out, his demeanor differed from when he was either sober or drunk— that his speech was slurred and "he acted silly, smiled a lot." Not only did this testimony suggest drug use, but defendant's periodic use of drugs was described on the stand by defendant himself, by his mother, by a childhood friend and by his psychiatrist.

[12] Ten mitigating circumstances were submitted for the jury's consideration in recommending a penalty for defendant's murder of Brenda Smith. The jury found only one—that defendant's family had a history of mental illness and emotional distress. Only two aggravating circumstances were submitted and found unanimously by the jury: in reference to his conviction for the murder of Joan

Brady, that defendant previously had been convicted of a felony involving the use of violence to the person, N.C.G.S. § 15A-2000(e)(3) (1988); and, in reference to offenses committed against Elaine Clay, Robbie Davis, James Hardy, and Tony Gammons, that the murder of Brenda Smith was part of a course of conduct that included the commission of other crimes of violence, N.C.G.S. § 15A-2000(e)(11) (1988). Defendant argues that the evidence fails to support the latter circumstance. A review of the evidence presented to the jury in the penalty phase proves the error of defendant's perception.

Elaine Clay, who had testified during the guilt-innocence phase of defendant's trial that defendant had asked to move in with her in order to "get away from" Joan Brady, was recalled in the penalty phase to recount the events of the early morning hours of 22 October 1984. She testified that she and her nine-year-old son were awakened by the sound of the smoke detector. They left the burning house and returned the next morning after the fire had been extinguished to find structural damage, including charred floor joists beneath her bedroom. The fire marshall who investigated the fire determined that it had originated from a pile of boxes. He also testified that he had "smelled something like gasoline." An experienced agent for the State Bureau of Investigation who also investigated the fire testified that in his opinion it had been set intentionally.

In addition to this evidence the State introduced the testimony of a police officer who was present at defendant's forceful occupation of his uncle's house the next evening. The officer related that defendant had "started talking about a house burning down, and he stated it was Elaine Clay's house . . . and stated that a friend had done it, and . . . that he should have just killed her himself." Asked by the witness if he knew whether Ms. Clay was in the house at the time, defendant had responded "yes, she was." Another officer present at James Hardy's house testified that defendant had said earlier that he had burned Ms. Clay's house to the ground and that her little boy was in it with her at the time. Only later did defendant say that "a friend had set the fire" and that Ms. Clay "got what she deserved."

The trial court instructed the jury that if it found beyond a reasonable doubt that defendant had committed arson at a time when Elaine Clay and her son were in bed, it would find the aggravating circumstance that defendant had killed Brenda Smith

as part of the same course of conduct. Defendant argues that these instructions were erroneous because they did not require the jury to find that this crime involved "violence against another person or persons." N.C.G.S. § 15A-2000(e)(11) (1988). He reasons that arson is not an inherently violent crime and that it was error to submit this circumstance to the jury when the State failed to present substantial evidence of the use or threat of violence in addition to the fact of the fire's occurrence.

Arson is "the wilful and malicious burning of the dwelling house of another person." *State v. Vickers*, 306 N.C. 90, 100, 291 S.E.2d 599, 606 (1982). This definition presupposes that the dwelling is inhabited, even if its inhabitants are absent at the time of the offense. *See id.* In their absence, arson is arguably not an offense that inherently involves "violence against another person or persons." However, when inhabitants are present and the perpetrator is aware of this fact, his act of igniting their dwelling is indisputably an act of violence, its force intended not only to damage the house but also to injure its inhabitants.

We hold that the trial court's charge to the jury was sufficient: by coupling the fact that the dwelling was occupied with the fact of a "wilful and malicious" burning, the instruction comprehended the threat to human well-being that the statute's aggravating circumstance contemplates. *Cf. State v. Hunt*, 323 N.C. 407, 429-30, 373 S.E.2d 400, 414-15 (1988) (absence of evidence that the house was occupied at the time of dynamiting provided basis for trial court's striking convictions on grounds that these did not involve the use or threat of violence to a person).

Whether the burning of Elaine Clay's house early Monday morning and the events at the home of James Hardy on Monday evening were part of the same course of conduct that included the murder of Brenda Smith depends upon a number of factors, among them the temporal proximity of the events to one another, a recurrent *modus operandi*, and motivation by the same reasons. *See State v. Robbins*, 319 N.C. 465, 528, 356 S.E.2d 279, 316, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987). Although the jury was properly admonished not to consider the murder of Joan Brady as part of this course of conduct, *see State v. Goodman*, 298 N.C. 1, 29, 257 S.E.2d 569, 587 (1979), it is apparent from a review of the chronology of events beginning Thursday, 18 October 1984, and culminating Monday evening, 22 October 1984, that defendant's

actions with regard to Elaine Clay and James Hardy were all elements of a five-day rampage fueled by defendant's overcommitment to women.

On Thursday afternoon, defendant stopped at Elaine Clay's house and asked to move in with her in order to "get away from Joan . . . Brady." He was at Joan Brady's house at 9:00 p.m. and at Brenda Smith's by 11:30 p.m. Joan Brady was found dead in her apartment the afternoon of Friday, October 19th. On Saturday afternoon defendant drove Brenda Smith from her house in Danville, Virginia to Greensboro. Later that evening defendant appeared alone at the Statesville home of a former girlfriend, whom he had not seen in four years, to tell her that he wanted her "to meet his fiancee." Defendant later picked up Brenda at a nearby convenience store where she had been waiting for him, and they drove back towards Greensboro, pulling off the road around 9:00 p.m. and spending Saturday night in her car. Brenda Smith called her parents at 8:42 a.m. and was found dead little more than an hour later. Defendant returned in Brenda's car to Danville, where he was seen walking down the street and greeted by Elaine Clay. Sometime after midnight Sunday, he appeared at Janice Bates' mobile home, calling her name. Around 1:45 a.m. Monday he ignited the boxes under Ms. Clay's bedroom. Monday evening defendant arrived at the home of his uncle James Hardy, bound and gagged his uncle, poured lighter fluid on his head and attempted to ignite it, and held a knife to the throat of Tony Gammon. The police arrived at 7:05 p.m. and were held at bay for five and one-half hours.

Not all of these occurrences were violent, but all occurred over a five-day span and involved either contact with a former girlfriend or, in the case of the hostage-holding, admissions about their fates. In addition to their proximity in time, all demonstrated the common subject matter of defendant's romantic liaisons and his mood of intense anxiety about juggling these relationships. Comments about being "good with shoelaces" made during the hostage-holding and the role of shoelaces in the murders of Brenda Smith and Joan Brady evoke a common *modus operandi*. The arson of Elaine Clay's house coupled with the attempt to ignite his uncle with lighter fluid and comments made at the time about his (or a friend's) setting fire to the Clay house also reveal commonalities. Defendant's activities from Thursday, 18 October 1984, through Monday, 22 October 1984, describe an increasingly frenzied pattern of both inconsequential and violent contacts, all apparently motivated

STATE v. PRICE

[326 N.C. 56 (1990)]

at least in part by the "pressure" brought upon defendant by his overinvolvement with women. We hold that these facts firmly support the submission to the jury of the aggravating circumstance that the murder of Brenda Smith on Thursday, 18 October 1984, was part of a course of conduct involving the commission of other crimes of violence, to wit: the arson of Elaine Clay's house and the hostage-holding on Monday, 22 October 1984.

[13] Defendant next assigns error to several issues arising out of the parties' closing arguments. He first contends there was error pertaining to the closing remarks of his own counsel, who was barred by the trial court from arguing "anything concerning the possibility of parole." He also asserts that the trial court erred in disallowing his proffered argument that if the jury returned a recommendation of a life sentence, the trial court was empowered to require the sentence to commence at the termination of the life sentence he was presently serving in Virginia.

Defendant argues that informing the jury of the legal effect of a life sentence upon parole eligibility in North Carolina and assuring jurors that the trial court was empowered to impose a life sentence consecutive to another would have mitigating value. Thus, even though such evidence would relate to neither defendant's culpability for the crime nor the circumstances of its commission, defendant perceives his license to present these matters to the jury as comprehended in his constitutional right to put before the jury "any relevant mitigating evidence." Skipper v. South Carolina, 476 U.S. 1, 4, 90 L. Ed. 2d 1, 6 (1986) (quoting Eddings v. Oklahoma, 455 U.S. at 110, 71 L. Ed. 2d at 9). Defendant also perceives his entitlement to argue these issues under N.C.G.S. § 84-14 (1985), which regulates the practice of law in this State and provides: "In jury trials the whole case as well of law as of fact may be argued to the jury."

While it is generally true that counsel's argument should not be impaired without good reason, Watson v. White, 309 N.C. 498, 507, 308 S.E.2d 268, 274 (1983), one "good reason" to limit argument is its irrelevance. "[C]ounsel [may not] argue principles of law not relevant to the case." State v. Monk, 286 N.C. 509, 515, 212 S.E.2d 125, 131 (1975). This Court has noted many times that a criminal defendant's status under the parole laws is irrelevant to a determination of his sentence and that it cannot be considered by the jury during sentencing. E.g., State v. Robbins, 319 N.C. at 518,

356 S.E.2d at 310. That this holding passes muster under the United States Constitution is implicit in the United States Supreme Court's recognition that "[m]any state courts have held it improper for the jury to consider or to be informed—through argument or instruction—of the possibility of commutation, pardon or parole." *California v. Ramos*, 463 U.S. 992, 1013 n.30, 77 L. Ed. 2d 1171, 1188 n.30 (1983) (quoted in *Robbins*, 319 N.C. at 520, 356 S.E.2d at 311). In other words, the Constitution *permits* such argument or instruction, but it is not constitutionally *required. Robbins*, 319 N.C. at 519, 356 S.E.2d at 311.

Argument concerning the effect of consecutive life sentences upon the period of a defendant's incarceration is, in another guise, argument about the legal effect of parole upon defendant's sentence. It is equally irrelevant to a determination of his sentence. The trial court acted correctly in disallowing both arguments.

[14] Defendant also contends that the trial court erred on three occasions during the prosecutor's closing argument by its failure to intervene *ex mero motu* and rectify improprieties to which defendant failed to object. Counsel are allowed wide latitude in arguing hotly contested cases, *State v. Huffstetler*, 312 N.C. at 112, 322 S.E.2d at 123, and the scope of this privilege is left to the sound discretion of the trial court, *id.* Although the appellate court may review an alleged error or impropriety in the State's argument notwithstanding the defendant's failure to flag the error for the trial court, "the impropriety . . . must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it." *State v. Artis*, 325 N.C. at 323, 384 S.E.2d at 496 (quoting *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979) ).

On the first occasion of which defendant complains, the prosecutor called the jury's attention to defendant's lack of remorse and his unwillingness to admit guilt: "He shows no remorse. He gives no confession. He asks no repentance. He is a stone-cold killer." Defendant contends that because the aggravating circumstance that the murder was heinous, atrocious or cruel was not before the jury, and because defendant had not opened the door to the issue of remorselessness by asserting he felt otherwise, the issue was irrelevant and its mention "exploited" his constitutional right to remain silent or to stand by his plea of not guilty.

STATE v. PRICE

[326 N.C. 56 (1990)]

An identical argument was proffered by the defendant in *State v. Brown*, 320 N.C. 179, 199-200, 358 S.E.2d 1, 15-16, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). Although remorselessness is not a statutory aggravating circumstance and may not be argued as such, *see, e.g., Brown*, 320 N.C. at 199, 358 S.E.2d at 15, we noted in that case and we note again here that the State never cited this characteristic as an aggravating circumstance to the jury either verbally or on the verdict sheet. *Id.* Moreover, we specifically held in *State v. Artis* that calling the jury's attention to an absence of perceptible remorse does not unconstitutionally "exploit" a defendant's silence at trial or his unwillingness to admit guilt. *Artis*, 325 N.C. at 327, 384 S.E.2d at 498. Urging the jurors to focus on their observation that defendant "shows no remorse" relates to the demeanor displayed by the defendant throughout the trial. Thus " 'rooted in' observable evidence," such remarks are not improper. *Id.* at 328, 384 S.E.2d at 498 (quoting *State v. Myers*, 299 N.C. 671, 680, 263 S.E.2d 768, 774 (1980) ).

[15]  Defendant also maintains that the trial court erred in failing to intervene *ex mero motu* on a second occasion — when the prosecution referred in his closing statement to the rights of the victim and those of her family:

> What about the victim's rights? What about the rights of Brenda Smith? We weren't allowed to bring in a lot of her family and a lot of her friends and show you pictures of Brenda Smith while she was alive or to tell you about her background and what type of person she was and what the value to be placed on her life to society was.

Defendant contends that these words rendered his sentence unconstitutionally unreliable in the same way that victim impact statements introduced to the jury during capital sentencing in *Booth v. Maryland*, 482 U.S. 496, 96 L. Ed. 2d 440, were held to be irrelevant to the sentencing decision and their admission to create "a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Id.* at 503, 96 L. Ed. 2d at 448. The United States Supreme Court has come to similar conclusions regarding a prosecutor's remarks characterizing the victim's personal qualities. *South Carolina v. Gathers*, 490 U.S. ---, 104 L. Ed. 2d 876, *reh'g denied*, --- U.S. ---, 106 L. Ed. 2d 636 (1989).

Unlike evidence placed before the jury in *Booth* and *Gathers*, however, the personal qualities of the victim and the devastation wrought upon her family by her death simply were not invoked by the prosecutor's words in this case. It is true that the "rights of the victim" and those of her family are not relevant to the proper focus of sentencing arguments upon the character of the criminal or the circumstances of the crime. *See, e.g., State v. Brown*, 320 N.C. at 202-03, 358 S.E.2d at 17. *See also South Carolina v. Gathers*, 490 U.S. at ---, 104 L. Ed. 2d at 883. But these issues were the subject of mere allusion by the prosecutor: if improper, the error was *de minimis*. It was well within the trial court's discretion not to intervene and recognize the error *ex mero motu*. *Brown*, 320 N.C. at 203, 358 S.E.2d at 18. Nor does the trial court's failure to intervene imply an abrogation of defendant's constitutional rights, for as we have held in *State v. Artis*, such "mere allusion to the loss the victim's family feels does not threaten to sweep juror ruminations into the realm of the arbitrary and capricious." *Artis*, 325 N.C. at 327, 384 S.E.2d at 498. Given the solid evidentiary foundation for the two aggravating circumstances found by the jury, we hold that any arguable error in the trial court's failure to intervene was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1988); *Artis*, 325 N.C. at 327, 384 S.E.2d at 498.

[16] The third occasion upon which defendant alleges the trial court erroneously failed to intervene was during the following portion of the prosecutor's argument:

> Jesus says in the Lord's prayer, "Forgive us our trespasses as we forgive those who trespass against us," but you have no right under the law. And you may forgive trespasses in your personal life, you may forgive those trespasses, but you have no right as a sworn juror in the State of North Carolina to forgive the trespasses against the State of North Carolina. That is to have no part in your deliberations. You cannot forgive the defendant for what he did to Brenda Smith. And your verdict, be it life or be it death, should be no reflection on any sympathy or forgiveness or any religious feelings you have about this case.

Defendant rests his argument solely upon the prosecutor's admonition in the last sentence above that jurors must not allow sympathy to inform their recommendation as to defendant's sentence. These words were not the subject of an objection at trial nor were they

**STATE v. PRICE**

[326 N.C. 56 (1990)]

included amongst defendant's designated exceptions comprising his assignments of error. Despite his failure to object, defendant contends that the trial court's failure to intervene constituted plain error. N.C.R. App. P. 10(c)(4) (1989); *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). This Court may review such alleged errors when their gravity "amounts to a denial of a fundamental right of the accused." *Odom*, 307 N.C. at 660, 300 S.E.2d at 378 (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)).

The scope of this Court's review on appeal, however, "is confined to a consideration of those assignments of error set out in the record on appeal." N.C.R. App. P. 10(a) (1989). Such assignments of error are sufficient only when they "direct the attention of the appellate court to the particular error about which the question is made, with clear and specific record or transcript references." N.C.R. App. P. 10(c)(1) (1989). The assignment of error addressing this argument in defendant's brief does not contain an exception or reference to the transcript or record, and the question raised therefore is not properly before this Court.

Nonetheless, "[i]n capital cases, . . . an appellate court may review the prosecution's argument, even though defendant raised no objection at trial," *State v. Brown*, 320 N.C. 179, 194, 358 S.E.2d 1, 13 (1987) (quoting *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979)), and even though an assignment of error may be presented improperly on appeal. *See State v. Chance*, 279 N.C. 643, 657, 185 S.E.2d 227, 236 (1971) ("in capital cases we review the record and *ex mero motu* take notice of prejudicial error"). We thus consider defendant's argument.

Defendant asserts that urging the jury not to rest its verdict upon feeling violates the prohibition in the eighth amendment against cruel and unusual punishment. In *California v. Brown*, 479 U.S. 538, 542, 93 L. Ed. 2d 934, 940 (1987), the United States Supreme Court held that it was constitutionally permissible for a trial court to admonish the jury not to be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." The Court reasoned that "mere" indicated to the jury that it was to avoid responding to emotional appeals divorced from an evidentiary basis. According to *Brown*, a defendant's eighth amendment rights are jeopardized only when the jury is urged to ignore such feelings that are supported by facts in the record.

In *State v. Artis* the prosecutor similarly urged the jurors "to try this case without . . . prejudice and without sympathy; strictly on the facts of this lawsuit." *Artis*, 325 N.C. at 325, 384 S.E.2d at 497. This Court held that because the apparent import of the prosecutor's words was that "[m]itigating circumstances are to be supported by the evidence, not by emotion," such language did not contravene defendant's rights under the eighth amendment to the United States Constitution. *Id.* at 326, 384 S.E.2d at 497. In the case now before us, the import of the prosecutor's words is even more clear and their propriety thus more apparent than the meaning of the same prosecutorial argument in *Artis*. The context cited by the prosecutor is blatantly not evidence but religious predisposition: the prosecutor was plainly and properly admonishing the jurors that feelings of sympathy and forgiveness rooted in their hearts and not also in the evidence may not be permitted to affect their verdict. In the above argument the prosecutor made absolutely no reference to evidence offered by defendant in mitigation, about which a sympathetic appraisal by jurors may be appropriate. *See State v. Oliver*, 309 N.C. 326, 360, 307 S.E.2d 304, 326 (1981). The prosecutor actually thus avoided the very error of which he is now accused by defendant.

[17] Defendant next contends that the trial court erroneously instructed the jury on the law, improperly emphasizing the significance and weight of the aggravating circumstances. In describing for the jury the significance of aggravating circumstances, the trial court defined such a circumstance as "a fact or group of facts which tend to make a specific murder particularly deserving of the maximum punishment prescribed by law." Defendant terms this definition a gratuitous and prejudicial misstatement of the law because, in his view, it suggests that finding a single aggravating circumstance makes a murder "particularly deserving" of the death penalty, and it does not make clear that the jury must determine that the aggravating circumstance substantially outweighs any mitigating circumstances.

Defendant's strained reading of this portion of the charge is fallacious for several reasons. First, the trial court instructed the jury according to the pattern jury instruction, N.C.P.I.—Crim. 150.10 (1983), in words virtually identical to those used by the trial court and found proper in *State v. Hutchins*, 303 N.C. 321, 351, 279 S.E.2d 788, 806 (1981). Second, the court did not state an absolute, as defendant suggests, but qualified the statement with the word

STATE v. PRICE

[326 N.C. 56 (1990)]

"tend," which means "to have a leaning, [to] serve, contribute, or conduce in some way or other." Black's Law Dictionary 1315 (rev. 5th ed. 1979). Third, we repeatedly have stated that a jury charge must be construed contextually and that isolated portions of it will not be held prejudicial when the charge as a whole is correct. *E.g., State v. Lee,* 277 N.C. 205, 214, 176 S.E.2d 765, 770 (1970). Finally, the very next sentence in the trial court's charge reiterated and emphasized the qualification, stating: "Our law identifies the aggravating circumstances which may — which might justify a sentence of death." Heard as a whole, these two sentences could not possibly have misled the jury as to the significance of finding an aggravating circumstance.

Defendant adds that the trial court defined a mitigating circumstance as "a fact or group of facts . . . which may be considered as extenuating or reducing the moral culpability of the killing or making it less deserving [of] extreme punishment." To say facts "may" be considered in mitigation, defendant avers, is not the equivalent of the trial court's allegedly prejudicial definition of an aggravating circumstance as one that "tends" to make a murder particularly deserving of the death penalty. Thus, defendant insists, the trial court's instruction is a thumb pressing the scales upon which the aggravating circumstances rest. Here defendant tortures syntax to shore an oversubtle argument. We see no distinction of any significance between the two qualifiers; there can be no question that any such nuance was similarly lost on the jury.

[18] Defendant also complains of the following language in the trial court's charge illustrating the process of weighing aggravating against mitigating circumstances in deciding upon recommending the imposition of the death penalty:

> After considering the totality of the aggravating and mitigating circumstances, you must be convinced beyond a reasonable doubt that the imposition of the death penalty is justified and appropriate in this case before you can answer the issue yes.

> In so doing, you are not applying a mathematical formula. For example, three circumstances of one kind do not automatically and of necessity outweigh one circumstance of another kind. The number of circumstances found is only one consideration in determining which circumstance outweighs others or in determining which circumstances outweigh others.

You may very properly emphasize one circumstance more than another in a particular case. You must consider the relative substantiality and persuasiveness of the existing aggravating and mitigating circumstances in making this determination.

Defendant asserts that the trial court's example reinforced the emphasis upon aggravating circumstances that he perceives in other portions of the charge. Again, we disagree. These words are taken directly from the pattern jury instructions, N.C.P.I. — Crim. 150.10 (1983), and mirror the language set out by this Court in *State v. McDougall*, 308 N.C. 1, 34-35, 301 S.E.2d 308, 327-28, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983), as "an example of appropriate instructions" on the issue of according weight to aggravating and mitigating circumstances. Read as a whole, the trial court's charge indicates perceptible emphasis on aggravating over mitigating circumstances. We hold that defendant's contentions otherwise are meritless.

[19]     The last of the errors alleged to have occurred during the penalty phase of defendant's trial concerns the period of the jury's deliberations. The trial court noted that the jury had deliberated from 2:55 until 5:00 p.m. the first day, and from 9:30 until 11:20 a.m. the next. At this point the foreman informed the trial court: "We're hung." The court then stated that after a recess it would instruct the jury from N.C.G.S. § 15A-1235 and allow the jury some additional time for deliberations. Defendant's subsequent objection was overruled, and his motion that the trial court recognize the jury's inability to reach a verdict and impose a life sentence as permitted by N.C.G.S. § 15A-2000(b) was denied. After a brief recess the trial court instructed the jury as follows:

Members of the jury, I am going to ask that you resume your deliberations in an attempt to return a recommendation. I have already instructed you that your recommendation must be unanimous, that is, each of you must agree on the recommendation. I shall give you these additional instructions.

First, it is your duty to consult with one another and to deliberate with a view to reaching a recommendation if it can be done without violence to individual judgment.

Second, each of you must decide the case and your recommendation for yourself, but only after an impartial consideration of the evidence with your fellow jurors.

STATE v. PRICE

[326 N.C. 56 (1990)]

Third, in the course of your deliberations you should not hesitate to reexamine your own views and change your opinion if you become convinced it is erroneous. On the other hand, you should not hesitate to hold to your own views and opinions if you remain convinced they are correct.

Fourth, none of you should surrender an honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a recommendation.

Please be mindful that I am in no way trying to force or coerce you to reach a recommendation. I recognize the fact that there are sometimes reasons why jurors cannot agree. Through these additional instructions I have just given you, I merely want to emphasize that it is your duty to do whatever you can to reason the matter over together as reasonable people and to reconcile your differences if such is possible without the surrender of conscien[t]ious conviction to reach a recommendation.

The jury resumed its deliberations at 11:47 a.m. and returned to the courtroom at 12:45 p.m. with the unanimous recommendation that the trial court sentence the defendant to death. The jury's recommendation was based upon its finding a single mitigating circumstance, which it concluded was not sufficiently substantial to outweigh the two aggravating circumstances it found. Defendant contends that, despite the trial court's stated effort not to force the jurors to a verdict, the effect of its requiring them to resume deliberations after what defendant avers was a "reasonable time" was coercive.

Defendant apprehends a similarity between the trial court's reiterated admonition that the jury's verdict must be unanimous here and a charge in State v. Smith, 320 N.C. 404, 358 S.E.2d 329 (1987), which this Court concluded had the probable effect of coercing a recommendation of death. Defendant is mistaken: the circumstances of this charge suggest no parallel with the unique facts in Smith. In that case the jury, having been instructed previously that a unanimous recommendation of death would result in a sentence of death and a unanimous recommendation of life in prison would result in a sentence of life imprisonment, returned after three hours of deliberations and asked: "If the jurors' decision is not unanimous, is this automatic life imprisonment or does the

STATE v. PRICE

[326 N.C. 56 (1990)]

jury have to reach a unanimous decision regardless?" *Smith*, 320 N.C. at 420, 358 S.E.2d at 338. This Court stressed that *"[i]n the context of the jury's inquiry*, the instructions probably were misleading and probably resulted in coerced unanimity." *Id.* at 422, 358 S.E.2d at 339.

The context of the trial court's instructions in the case *sub judice*, however, differs radically from that in *Smith*. The instructions were not prompted by a question concerned with the requisite of unanimity. The trial court deliberately stated that it was "in no way trying to force or coerce [the jurors] to reach a recommendation," and urged them to "reconcile [their] differences *if such is possible* without the surrender of [their] conscien[t]ious conviction[s]" (emphasis added). The lesson in *Smith* is that, in telling a jury that its recommendation as to punishment must be unanimous, the trial court must be vigilant to inform the jurors that whatever recommendation they *do* make must be unanimous and not to imply that a recommendation *must* be reached. The context of the trial court's instruction in this case patently falls within the former category, and in such a context, reminding the jury that its findings and recommendations must be unanimous is perfectly proper.

The provisions governing capital punishment state: "If a jury cannot, within a reasonable time, unanimously agree to its sentence recommendation, the judge shall impose a sentence of life imprisonment." N.C.G.S. § 15A-2000(b) (1988). This Court has noted frequently that "what constitutes a 'reasonable time' for jury deliberation in the sentencing phase should be left to the trial court's discretion." *E.g., State v. Johnson*, 298 N.C. at 370, 259 S.E.2d at 762. This is so because "the trial judge is in the best position to determine how much time is reasonable under the facts of a specific case." *State v. Kirkley*, 308 N.C. 196, 221, 302 S.E.2d 144, 158 (1983). In *Kirkley* the jury's deliberations spanned seven and one-half hours, during which time it was interrupted twice for meals and twice for further instructions. Its deliberations included the contemplation of fourteen mitigating circumstances and one aggravating circumstance, and it was required to make sentencing recommendations for two separate murder convictions. This Court concluded that requiring the jury to resume deliberations was within the trial court's discretion under the circumstances: "We cannot say from the facts of this case that the trial judge abused his discretion by refusing to impose a life sentence in each capital case on the basis that the jury could not reach a unanimous sentence

recommendation within a reasonable time period." *Kirkley*, 308 N.C. at 221, 302 S.E.2d at 158. In *Johnson* the jury deliberated for three hours and thirty-nine minutes before it announced that it could not reach a verdict. This Court held that it could not agree with the defendant that this period was unreasonable and held that the trial court had not abused its discretion in coming to the same conclusion.

Here the jurors had before them two aggravating circumstances and ten mitigating circumstances. They had deliberated these issues and the question of a sentencing recommendation for nearly four hours over a period of two days. The trial judge heard all the evidence in support of mitigating and aggravating circumstances, observed the jurors' demeanor, and instructed them according to the law as he determined necessary to their comprehension of their duty as jurors. He was thus "in the best position to determine how much time [was] reasonable" for the jurors' deliberations regarding a recommendation for punishment under the facts of this case. *State v. Kirkley*, 308 N.C. at 221, 302 S.E.2d at 158. We hold that in the context of these facts, the trial court did not abuse its discretion in instructing the jury according to the law and in requesting it to resume its deliberations.

PRESERVATION ISSUES

Defendant attempts to resuscitate several issues upon which this Court recently has ruled. As defendant proffers no new or convincing reason to question these holdings, we reject the following contentions on the authority of the cited case law:

[20] Requiring a jury unanimously to find mitigating circumstances does not violate a defendant's eighth amendment rights. *State v. McKoy*, 323 N.C. 1, 30-42, 372 S.E.2d 12, 27-36 (1988), *cert. granted*, --- U.S. ---, 103 L. Ed. 2d 180 (1989).

[21] Informing the jury of its "duty" to return a recommendation of death when it finds mitigating circumstances insufficient to outweigh aggravating circumstances and the latter sufficiently substantial to call for the death penalty passes constitutional muster. *E.g., State v. Artis*, 325 N.C. at 336, 384 S.E.2d at 503; *State v. McDougall*, 308 N.C. at 34, 301 S.E.2d at 327-28.

[22] Excusing for cause jurors who have stated opposition to the death penalty was held constitutionally permissible in *Lockhart v. McCree*, 476 U.S. 162, 90 L. Ed. 2d 137 (1986), and by this

Court in *State v. Oliver*, 309 N.C. at 337, 307 S.E.2d at 313, and more recently in *State v. Artis*, 324 N.C. at 336, 384 S.E.2d at 503-04, and *State v. McNeil*, 324 N.C. 33, 57, 375 S.E.2d 909, 923 (1989).

[23] Placing the burden on defendant to prove each mitigating circumstance by a preponderance of the evidence and not conversely requiring the State to prove the nonexistence of each proffered mitigating circumstance beyond a reasonable doubt was held constitutional in, *e.g., State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980).

[24] Finally, defendant urges this Court to reverse its holding, stated in, *e.g., State v. Barfield*, 298 N.C. at 354, 259 S.E.2d at 544, that the present death penalty statutes, N.C.G.S. § 15A-2000 through -2003, are constitutional. We again decline this invitation for the reasons stated in that case and its progeny.

PROPORTIONALITY REVIEW

[25] Having concluded that no prejudicial error marred the guilt or sentencing phase of defendant's trial, it is this Court's statutory responsibility to ascertain that the death penalty in this case was imposed neither arbitrarily nor capriciously. N.C.G.S. § 15A-2000(d)(2) (1988). This assessment entails determining (1) whether the record supports the aggravating circumstances found by the jury, (2) whether the sentence was imposed under the influence of passion, prejudice, or some other arbitrary factor, and (3) whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. *State v. Artis*, 325 N.C. at 337, 384 S.E.2d at 504; *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983).

Cognizant that this statutory responsibility is as serious as any an appellate court must shoulder, *e.g., State v. Jackson*, 309 N.C. 26, 46, 305 S.E.2d 703, 717 (1983), we have undertaken a sober and scrupulous review of the record, transcripts, exhibits and arguments presented in the briefs and orally. This scrutiny has revealed to us that the record fully supports the jury's finding of the two aggravating circumstances submitted. It has further revealed no prejudicial, impermissibly emotional or other arbitrary influence upon the jury's recommendation or upon the trial court's imposition of the sentence of death.

STATE v. PRICE

[326 N.C. 56 (1990)]

Proportionality review entails comparing this case to all cases arising since 1 June 1977 that have been tried as capital cases and that have been affirmed as to both phases of the trial by this Court after appellate review. *Jackson*, 309 N.C. at 45, 305 S.E.2d at 717 (quoting *State v. Williams*, 308 N.C. at 79, 301 S.E.2d at 355). This includes not only a reappraisal of the relative weight of aggravating and mitigating circumstances, but also a scrutiny of the entire record for all the circumstances of the case, including the manner of the commission of the crime and the defendant's character, background, and mental and physical condition. *State v. Artis*, 325 N.C. at 338, 384 S.E.2d at 505; *State v. McLaughlin*, 323 N.C. 68, 109, 372 S.E.2d 49, 75 (1988). We do not feel compelled to cite every case consulted. *E.g.*, *State v. Artis*, 325 N.C. at 338, 384 S.E.2d at 505.

The two aggravating circumstances submitted to and found by the jury were that defendant had been previously convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3), and that the murder of Brenda Smith had occurred as part of a course of violent conduct by defendant, N.C.G.S. § 15A-2000(e)(11). Ten mitigating circumstances were submitted to the jury, but it found only one to exist—that defendant's family had a history of mental illness. The jury specifically rejected mitigating circumstances that defendant was under the influence of mental illness or emotional disturbance and that his capacity to conform his conduct to the requirements of the law was impaired by manic depression, schizophrenic illness, emotional instability, drug abuse, drug-induced mental illness, or mixed personality disorder. The testimony of certain witnesses for the defense supported the submission of these mitigating circumstances to the consideration of the jury, but it was "the jury's duty to decide what to believe," *State v. McKoy*, 323 N.C. at 29, 372 S.E.2d at 27 (quoting *State v. Smith*, 305 N.C. 691, 705-06, 292 S.E.2d 264, 273-74, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982)); it is not the duty of this Court. "Determining the credibility of evidence is at the heart of the fact-finding function." *Id.* (quoting *State v. Jones*, 309 N.C. 214, 220, 306 S.E.2d 451, 456 (1983)).

It is useful in proportionality review to compare the case under scrutiny to three clusters of cases in the pool—those cases resulting in a sentence of life imprisonment in which the same aggravating circumstances occurred, those "death affirmed" cases in which the same aggravating circumstances occurred, and those cases in which

this Court has found the death sentence disproportionate. In so doing, it becomes apparent whether the sentence imposed in the case *sub judice* is disproportionate or excessive, or whether it appears to be appropriate given the general parameters of cases to which it is factually akin.

The single characteristic distinguishing the first two classes of cases from the last is the fact that the defendant has killed more than once. We have remarked before, and it bears repeating, that this Court has never found disproportionality in a case in which the defendant was found guilty for the death of more than one victim.

> This Court has found the death sentence disproportionate in seven cases. *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds, State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983). In none of these cases was the defendant convicted of more than one murder.

*State v. McNeil,* 324 N.C. at 59-60, 375 S.E.2d at 925.

There are, however, a number of cases in the group of those where death sentences were affirmed on appellate review, in which the defendant has taken the life of more than one victim. Many of these appear distinguishable from the case before us by the presence of the aggravating circumstance that the murder committed was especially heinous, atrocious or cruel. N.C.G.S. § 15A-2000(e)(9) (1988). *See, e.g., State v. Huff,* 325 N.C. 1, 381 S.E.2d 635 (1989); *State v. McNeil,* 324 N.C. 33, 375 S.E.2d 909; *State v. McLaughlin,* 323 N.C. 68, 372 S.E.2d 49; *State v. McDowell,* 301 N.C. 279, 271 S.E.2d 286 (1980), *cert. denied,* 450 U.S. 1025, 68 L. Ed. 2d 220, *reh'g denied,* 451 U.S. 1012, 68 L. Ed. 2d 865 (1981).

Nevertheless, a number of other cases in the pool share the characteristic of a multiple murder with the case before us. In *State v. Robbins,* 319 N.C. 465, 356 S.E.2d 279, the jury found not only the prior violent felony aggravating circumstance, N.C.G.S. § 15A-2000(e)(3), but also that the murder for which the defendant was on trial had been committed while the defendant was engaged

in committing a robbery, N.C.G.S. § 15A-2000(e)(5). Although the jury found in mitigation that defendant had been under the influence of a mental or emotional disturbance at the time of the murders and that his capacity to appreciate the criminality of his acts had been impaired, this Court concluded that it was "clear from his convictions of premeditated and deliberate murder that human life meant little to Robbins." *Robbins*, 319 N.C. at 529, 356 S.E.2d at 316. This Court did not fail to note the gravity of the aggravating circumstance that *Robbins* shares with this case: "A heavy factor against Robbins is that he is a multiple killer." *Id.*

In *State v. McKoy*, 323 N.C. 1, 372 S.E.2d 12, the single aggravating circumstance found by the jury in addition to the prior violent felony circumstance was that the murder was committed against a deputy sheriff while engaged in the performance of his official duties. N.C.G.S. § 15A-2000(e)(8) (1988). The jury found two circumstances in mitigation. This Court noted with regard to the earlier murder supporting the prior violent felony circumstance that this "unlawful killing of another human being with malice . . . was . . . among the most serious of the many felonies 'involving the use or threat of violence to the person.' " *McKoy*, 323 N.C. at 48, 372 S.E.2d at 38 (citations omitted).

A third analogous case in which a prior conviction for murder was before the jury as an aggravating circumstance was *State v. Cummings*, 323 N.C. 181, 372 S.E.2d 541 (1988). This is the only case in the proportionality pool in which the second killing was designated as "another capital felony" under N.C.G.S. § 15A-2000(e)(2). *Cummings*, 323 N.C. at 197, 372 S.E.2d at 552. The Court remarked upon the unique status of the two aggravating circumstances (e)(2) and (e)(3) as being the only circumstances that "reflect upon a defendant's character as a recidivist," *id.*, and cited the following three cases in addition to those described above, in which the defendant had been convicted of a prior violent felony resulting in the victim's death: *State v. McLaughlin*, 323 N.C. 68, 372 S.E.2d 49 (previous conviction of involuntary manslaughter); *State v. Taylor*, 304 N.C. 249, 283 S.E.2d 761 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983) (previous conviction of murder in the first degree); *State v. McDowell*, 301 N.C. 279, 271 S.E.2d 286 (previous conviction of murder in the second degree). In three of the four cases cited in *Cummings* some mitigating circumstances had been found; in *Cummings* the jury found none.

STATE v. PRICE

[326 N.C. 56 (1990)]

The Court distinguished *Cummings* from *State v. Withers*, 311 N.C. 699, 319 S.E.2d 211 (1984), in which a multiple murder occurred yet the defendant received a sentence of life imprisonment. In *Withers* the defendant shot and killed his fiancee's twelve-year-old daughter after an argument concerning her accusations of sexual abuse, then shot his fiancee and himself. Sixteen years before, he had been convicted of murder in the first degree, and he had been paroled after serving thirteen years in prison for that crime. The jury found the same two aggravating circumstances in *Withers* as were found in the case before us—that defendant had previously been convicted of a violent felony and that the murder was part of a course of violent conduct. In *Withers*, however, the jury also found one or more of the ten mitigating circumstances submitted.[4] The Court in *Cummings* found *Withers* distinguishable from the other cases in which a multiple murder underlay the jury's finding of a prior violent felony or other capital felony because of this "substantial mitigation." *State v. Cummings*, 323 N.C. at 196, 372 S.E.2d at 553. A similar distinction applies to the case now before us: although a single mitigating circumstance was found by the jury—that defendant's family had a history of mental illness— this was not "substantial mitigation" underlying the appropriateness of a life sentence. Rather, compared to the number and significance of the circumstances the jury specifically rejected, its mitigating effect appears slight.

In *State v. McNeil*, 324 N.C. 33, 60, 375 S.E.2d 909, 925, this Court noted three other cases involving multiple murders in which the juries returned life sentences: *State v. King*, 316 N.C. 78, 340 S.E.2d 71 (1986); *State v. Whisenant*, 308 N.C. 791, 303 S.E.2d 784 (1983); and *State v. Crews*, 296 N.C. 607, 252 S.E.2d 745 (1979). The killings in each of these cases, however, appear less heinous than the deliberate, senseless, sequential murders that underlay this defendant's sentence of death, both of which resulted in convictions of murder in the first degree. In *King*, the defendant shot into the house where his former girlfriend was hiding, killing not the girlfriend, but her mother and sister. He was convicted of murder in the first degree on the basis of felony murder, not on the basis of premeditation and deliberation. In *Whisenant*, the

---

4. Because the jury there failed to specify which of the ten mitigating circumstances applied, we must assume for purposes of proportionality review that all ten circumstances were found. *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

defendant was convicted of murder in the first degree of an elderly man, but only of murder in the second degree of the victim's housekeeper. In *Crews*, two victims died when the defendants lured them to their campsite, but each died at the hands of a different defendant.

It is readily apparent that the facts and circumstances surrounding defendant's murder of Brenda Smith reveal a very different kind of killing than those in the cases in which the jury returned a sentence of life. Defendant was a man who admitted to a cellmate that he had been dating too many women and suffering too much pressure, causing him to feel he had to "eliminate" somebody. With this end in mind he murdered Joan Brady by ligature strangulation, a torturous mode of death that, like manual strangulation, is a prolonged process "during which the victim's life is quite literally in the hands of the assailant [and] . . . the victim is rendered helpless, aware of impending death, but utterly incapable of preventing it." *State v. Artis*, 325 N.C. at 319, 384 S.E.2d at 493. Two days later defendant took the life of Brenda Smith in exactly the same way. That night he ignited the house of a third girlfriend, intending for her and her young son to burn to death in the fire. These grossly excessive attempts to disentangle himself from overabundant romantic commitments, followed shortly after by an evening of threatening and terrorizing his uncle, were so depraved as graphically to "demonstrate a callous disregard for the value of human life." *State v. Cummings*, 323 N.C. at 199, 372 S.E.2d at 553. Worse, the murders and attempted murder of girlfriends—women who had cared for and been intimate with defendant and who at the time of defendant's assault upon them had no apparent quarrel with him—were "especially cold-blooded because of the absence of any motive of the sort which is usually powerful enough to cause one human being to destroy another." *State v. Greene*, 321 N.C. 594, 614-15, 365 S.E.2d 587, 599, *cert. denied*, --- U.S. ---, 102 L. Ed. 2d 235 (1988).

We have scrupulously reviewed the record and measured defendant's contentions of error in both the guilt phase and the penalty phase of his trial against the law. We conclude that no prejudicial error tainted either phase. Our careful and comprehensive review of other capital cases arising since 1 June 1977 reveals that the facts and circumstances of defendant's crime and character are more like those in similar cases in which a sentence of death has been affirmed than like those in cases in which the perpetrator

received a sentence of life imprisonment. We thus cannot hold that the sentence of death recommended by the jury and imposed by the trial court in this case is disproportionate or excessive as a matter of law.

No error.

Judge· FRYE concurring in the result.

One of the preservation issues raised by defendant relates to the applicability of the United States Supreme Court's decision in *Mills v. Maryland*, 486 U.S. ---, 100 L. Ed. 2d 384 (1988), to the unanimity requirement for mitigating circumstances in determining whether death is the appropriate punishment in a given case. This issue is now pending before the Supreme Court of the United States. *See State v. McKoy*, 323 N.C. 1, 372 S.E.2d 12 (1988), *cert. granted*, --- U.S. ---, 103 L. Ed. 2d 180 (1989). While I believe that *Mills* is applicable to North Carolina, *see State v. Lloyd*, 321 N.C. 301, 364 S.E.2d 316, *vacated and remanded on other grounds*, --- U.S. ---, 102 L. Ed. 2d 18, *reinstated*, 323 N.C. 622, 374 S.E.2d 277 (1988) (Exum, C.J., and Frye, J., dissenting), assuming error arguendo, I would find the error nonprejudicial under the peculiar circumstances of this case.